For today, which is Shavonda, Shavonda, Bonda, Bailey v. et al. v. Nathan Preston et al. We'll hear first from Christopher Gale. Yes it is, Your Honor. May it please the Court. We're here today for an older case. It's from 2011. The basic facts, as everyone may want to know, are that my client, or the deceased, a paranoid schizophrenic, was having problems. He was being followed, thinking that he might be committing DWI, or he was under the influence. He went on a very slow speed, I don't even want to say chase, because he wasn't even going above the speed limit. But eventually he made his way to his home. And there he surrendered, and then thereafter is when sort of a difference of opinion occurs. One of the things, and I've been before this Court so many times, arguing some real legal matters. And we're arguing differences in what the law is, and the interpretation. But I think really today we're here for an interpretation of facts. In the underlying memorandum opinion, Judge Lamberth, when he decided the decisions in this case, I'm asserting that he went beyond his role as a judge, and basically usurped the jury's abilities and responsibilities in regards to this case. And that his order was very heavy-handed, one-sided, and I... Okay, but you'll agree with us that if the video slash audio, it's largely audio, but a little bit of video, just contradicts and demonstrates that what a witness said can't be true. If the witness said something lasted 15 minutes, and the audio shows it was only 5, then the court has to, under Scott v. Harris, follow the video slash audio. Is that a fair statement? Yeah, I don't agree with the Scott case. If you have something in regards to the facts that's obviously been contradicted, I just don't think that works in regards to this case. I mean, even just a little bit of the audio, and it's deactivated for part of it, it really doesn't tell you what's going on. The video portion of it... It does tell us timing. It also contradicts your idea that he was going slow. I mean, throughout the chase, he's going to 50, 60 miles an hour. I mean, maybe that's slow in your world, but that's not what I think of as a slow car. He's on a highway for quite some time, not pulling over, and going at not school zone rates of speed. We'll just say that. And maybe my choice of words was incorrect. Maybe not slow, but it was never above the posted speed limit. 100 miles an hour, I agree. And I think one of the concerns is, you know, in regards to the Graham factors, whenever you're determining whether the use of force was necessary, one of them is to determine the need for it, and one is to consider the severity of the crime. You know, in this case, he was not being pursued for anything that was an aggressive, or an assault, or a robbery, or anything else of that nature. He was thought to have committed, or being committed, DWI, driving while intoxicated. That's the crime. Okay, that's a potentially deadly crime, unlike Mr. Pratt in Pratt v. Harris County, who failed to identify himself and ended up dead. And I was on the one in a 2-1 decision granting qualified immunity there. The facts to me there are far more helpful to the plaintiff than the facts here. So now that I've been overruled by my colleagues, am I not bound by Pratt v. Harris? Am I not bound by Mullinex v. Luna with Supreme Court? Reversed our court, on which I was on the panel, also on a situation that I thought was far more plaintiff-friendly than your situation. How can you distinguish those cases? I think the facts of our case are definitely different. In regards to this particular case, what you have is a plethora of not only officers, weapons, and a multitude of injuries associated with this. Looking at this case, you're talking about not only the officers, let's see, six of the eight officers admitting to the conduct that they did. Two of the officers giving statements that say he was not resisting. He was just standing there when he was suddenly tased and beaten. You have a person who has hemorrhages, went into a coma from being hit in the head from an ass, at least twice, and that's just admittedly by the officers, tased from eight to ten times, beaten, kicked, hit, punched, every part of his body. At what point were the officers informed, if any time, that Preston was a schizophrenic, paranoid schizophrenic? When he came into the cul-de-sac at the beginning of the fray, let's call it. So they knew pretty early on. And the judge pointed out in his order, he said, I think that plays for the officers. And whether that's true or not, and I think it could play either way depending on how you argue it, and that's the important part of this case, is that is there a genuine issue of material fact in regards to the excessiveness of the force? The judge himself in the order said it's arguably excessive. Arguably excessive. That's exactly my point. I am not saying that. Yeah, but that isn't the standard, is it? Qualified immunity is a high hurdle, whether it should be or shouldn't be, isn't up to me. And the second prong, which is that they needed to be on notice, so that all but the plainly incompetent and knowingly wrongful people have to be on notice. And what case can you analogize to that would show us that the conduct here, given all the facts that we have, was a violation of Mr. Aberdathy's constitutional rights? And I think one of them that I cited in the brief was Ramirez v. Taser Joe Martinez. It was a case that was decided by this court. It was a tasing case. Now, granted, the facts of that case weren't as egregious as the facts that are in place here, but in that case, this court found that even if someone was resisting, it did not, or at least it led to a genuine issue of material fact in regards to the use of force that was necessary by the use of the taser. Now, in this case, we have not only the use of the taser almost a dozen times, we have the use of afts, which is a long metal object upon his cranium, and we have a variety of hitting and kicking during that time period. The evidence in this case, at most, even by the officer's own reports and testimony, shows that Mr. Aberdathy was, at best, moving and resisting of some kind, but he has never caused a threat to anybody. He didn't have any weapons. He never kicked anybody. He never hit anybody. He never tried to tackle anybody. He never did anything. And the plaintiff's witnesses, most of them, have stated that they never saw him doing anything except trying to get away. In your excessive force argument, what role does the continuation play after they have got him? I mean, there are nine officers there. It sounds as though they were sharks on a feeding frenzy. You have five tased, six nightsticks, punched, kicked, bitten by a canine dog, and yet they continue and they try to get in front of each other so they can have their turn at him. Obviously, they had to subdue him at first, but when does that stop and become unreasonable? I think there were some concerns initially, but, you know, I'm not going to sit here and say that force wasn't necessary in some respects and wasn't justified. I'm not asking that. Yeah. I'm asking at what time, because of the time continuum and the way they continued it, does that affect excessive force? Yeah. I mean, I think one of the factors that you're always going to make a determination is what efforts to temper the severity of the force were used at that time, and there was none. In fact, it was just the opposite. Like you said, they have people sort of tag-teaming to come in and do things. They have people putting on their black gloves, coming in to get ready to do some damage. So whether it's two minutes or 20 minutes or 15 minutes, there was no effort to try to temper the use of force that was used in this case. In fact, all efforts were used just to increase it. Okay. I mean, they hog-tied Mr. Pratt and killed him, and he wasn't doing anything. He didn't have the DWI or anything. He was just wandering around kind of waving his arms, acting weird, and he ends up dead. And our court said, well, that's qualified immunity. You know, in Mullenix v. Luna, this guy's driving down the street, and somebody gets up on an expressway over the expressway and starts shooting at him. The officer does that, and the Supreme Court said that's qualified immunity. And there's a long list of these kinds of cases. I mean, the fact is, if we were sitting down to write on a fresh slate, these facts would sound pretty bad. But I'm struggling with the fact that we have a very long line of cases that, frankly, have worse facts, and people end up dead, and there's still qualified immunity. And I took an oath to follow those cases, whether I particularly personally would have ruled that way myself or not. And, in fact, in Pratt, I was in the dissent. But that's okay. The Supreme Court denied certiorari. That's the law of our court, and I'm bound by it. So how can you – I'm very sympathetic to the concerns you're expressing, but I'm bound by the law. And the law is pretty hard on this topic for your position. I would agree with your concerns, and I would agree that – and with all due respect to this court and any other – that I think sometimes we have lost sight of the fact that juries are to try these cases where the facts are so indifference or incongruous, and we've almost become to where we're getting rid of the juries to make those decisions. I would tell you that in regards to a lot of the asphyxiation cases or otherwise. Mr. Gale, I suppose an argument could be made that the officers continued using force because Mr. Preston would not let his left hand be cuffed. And had they been able to do that, they got a cuff on his right hand. And had they done that right away, this might not have happened. But he apparently is a very strong person who was intoxicated on cocaine maybe. And they would argue every act they did was simply to try to cuff his other hand and subdue him. And even with all the tasers and the force they used, they were not able to do it for five or ten minutes. So what would you have had them do other than what they did? Well, first of all, we're kind of assuming that he was resistant during that entire time when there's evidence to the contrary, is that he wasn't. If anything, he was resisting a beating. Who actually could see his hands that testified he wasn't resisting? There's a lot of people off on the fringes who admitted it's dark, they couldn't see his hands, and they're saying, I don't think this was very good, what was happening. And I can respect their views, but who was in a position to really see, because you're having to look at it from the officer's objective vantage point, who could see that of these witnesses you're talking about? Well, unfortunately, they can only see the swing of a hand and a hand going down to cause an impact. They didn't actually see the impact. They could hear things, they didn't actually see it. In cases in which there's only two people that know it and the other person's deceased, and you only have an officer's version of events, then you have to take that with a grain of salt. That's not our case law, though. I mean, in Ontiveros, we didn't take that with a grain of salt. The two people, one was the police officer, one was dead, was shot. I mean, that's a problem. You're basically asking us to assume the officers are bad and we're doing something wrong if we don't have evidence to the contrary, and that's really the opposite of what the law actually is. Well, I think the Bazan, I think it's a Dalgo County case out of the Fifth Circuit, states it was a shooting case. The only persons that were there to testify what happened in the shooting were either the deceased or the officers that shot him. And because the officers were the only ones that were left, you were not left with this idea that you had to accept what they say. You can look at the other evidence in regards to this case. And this evidence in this case, of any case, should preclude the introduction of qualified immunity in regards to it and at least creating a general issue of material fact to go to the jury. That's why we requested it, and that's why we're asking to you. Let me just very quickly ask you about this issue of whether the force directly, only and directly caused the languages, resulted directly and only from the use of force. The medical examiner said that he died of the combined effects of intoxication with cocaine, a prolonged struggle, and an enlarged heart. Cardiomyopathy, they put it in the technical term, but enlarged heart. Does that sound like directly and only to you? Well, yes, Your Honor. I mean, for the purposes of 1983 litigation, whether you're talking about the death or just injuries, you have to show an injury. I mean, the multiple contusions, fractures, hematomas, things of that nature, are certainly sufficient to... Yeah, but the injury slash death has to be caused by the excessive force, not by the force. I mean, if somebody's about to shoot me and I shoot them back, I'm sure I've injured them. But was that excessive force? Then if they're already on the ground unconscious and I start beating on them, that's the injury from the excessive force. But the original gunshot wound, not. So that's what you have to separate, and I haven't seen that that was really done here. Where is the whole song about taking the victim as you find him? They didn't have to know about his cocaine or his enlarged heart or any of that stuff. So doesn't that play into Judge Haynes' question? I think when you have concerns of that nature or what you call an excited delirium, I'm out of town, but in regards to excited delirium or otherwise, then, yeah, you have this issue, and it does rely upon whether the force was excessive or not. If it was an excessive force, it was unnecessary, and they have some of their prior condition, whether it be mental illness or drug-induced state, anything of that nature, then it's still going to be a constitutional violation that's directly related to it. It doesn't obviate the fact that just because there is some preexisting condition. Now, if the force wasn't excessive, then regardless of the condition, then there wouldn't be a constitutional violation. So it is important to understand that concept, but in regards to the 1983 case, which you have to show minimal injury, but I think there's a direct correlation between his death and the use of force. Now, whether it's directly related and he caused as a result of the hematomas to his head when he was in a coma for several days and or whether it was because of some preexisting condition that otherwise exacerbated itself and caused his death as such as excited delirium, either way, you've met the sufficient evidence in regards to the 1983 analysis to go to the jury. Okay. Maybe on rebuttal you can bring us record sites for that and case sites for that. You have five minutes on rebuttal, Mr. Cahill. Thank you, Your Honor. Mr. Balls? May it please the Court, Your Honor. Nathan Rawls, Mark Rawls for all of the defendants. Your Honor, to address Judge Haynes' concern, first of all, Mr. Abernathy, Pierre Abernathy is the individual who actually died in this incident, and I think Judge Haynes is correct that there's no evidence whatsoever that Mr. Abernathy died of the injuries that he sustained and admittedly sustained during the incident itself, but rather the Bexar County medical examiner found that he died of the combined effects of cocaine intoxication, a prolonged struggle with the police. But did they have to prove the death was caused by that, or is it enough that injuries were caused by it? If we assume arguendo excessive force that caused injuries, can his family not recover at least for that, even if the death would have been inevitable from the non-excessive force? Yes, Your Honor, I think so. I think that's the point he was trying to make, although I'm not sure he made it quite that way. All right. Yes, there's a survivorship cause of action that the estate would have, and if he suffered injuries as a result of excessive force during that period of time. If the prolonged struggle was excessive, that clearly was sufficient cause of death to allow recovery. So that gets really back to the core of this case, I think, is whether the officers were acting reasonably in continuing to try to subdue this man after he refused to let his left hand be handcuffed. Well, Your Honor, a couple of things there. First, as far as the prolonged struggle, we have to keep in mind that this individual was 6'1", 250 pounds. All of the officers said he was incredibly strong. The single eyewitness on the porch, Gary Hovermail, said that he was extremely-appeared to him to be very strong and continued to resist the entire time the officers were trying to get him subdued, get his left hand handcuffed. And so the prolonged struggle was the result of Mr. Abernathy's actions, not the officers' actions. They used, as Judge Lambert pointed out, every single type of force short of lethal force that they could use to bring him under control that day, and they finally were able to do that in front of Mr. Abernathy. Is there any evidence that after he was handcuffed they continued to tase or beat him? The evidence is the opposite, Your Honor. Gary Hovermail, the sole eyewitness to what was going on with Mr. Abernathy in his front yard, had a direct view of the situation, said that as soon as he was handcuffed, all the police officers' actions stopped. So there is no evidence, direct evidence of any excessive force, any action on the part of the police officers after he was totally handcuffed. At what point was the dog released upon him? The dog-I'm sorry, Your Honor, we finished. At what point in the struggle? That's the only thing I see that might could have been done sooner and quicker than they did. You know, that's interesting, Your Honor. The dog-once the-he was-the dog was released actually a little bit before. I'm not sure exactly what the time was, but before he comes into view on the video. What happened was that Aubrey Plache, who was the officer, who was the canine officer that had that dog, released, went to his truck and got the dog, had him on his leash, released him. An officer stepped on the leash of the dog and stopped him. The dog then got loose from that, took off for Mr. Abernathy, and got his leash caught under the tire of a car, got free from that. And then you can see at about, I want to say maybe 326 or something into the-maybe a little later, 327 into the video, about maybe a minute or two after the actual struggle began, the dog was released. And after Mr. Abernathy had been handcuffed with one on his right hand and had a loose handcuff to use as a weapon, after he had been tased, after he had fought off three officers at least at the car site, after he had crashed through his mother's door, after he had struggled with a couple of other officers at his mother's door, only then really was it clear to Officer Plache that the intermediate weapons and the use of open hand techniques was not going to be sufficient to bring Mr. Abernathy under control. At that point, he released the dog. So, going on. All right. Let me ask you this because the thing that bothers me the most about your side of the case in looking at the video, the video doesn't show a lot of the actual action with Mr. Abernathy, but what it does show is a lot of officers kind of wandering around. They're not running over there. They're not helping as far as I can tell. They're just kind of standing around. And it seems a little bit weird to have this very intense effort to get this man under control, and he's got one handcuff hanging out, and he's strong, and they're beating him, and they're tasing him, and then you've got some officers kind of wandering around, dum-de-dum-de-dum. Can you explain that? Well, I can explain my version of it, Your Honor. Okay. And that is that you're right. You can see on the video that once the dog is released and once the dog basically catches up with Mr. Abernathy as he's going through, as the dog and Mr. Abernathy are going through the video from one side to the other, their six officers are sort of following, not in what I would call a full-out trot, to catch up with Mr. Abernathy, but that's what the dog's for. And the dog had actually, maybe not right in the video itself, but actually caught up with Mr. Abernathy. And so the officers, the point of the dog is to get the suspect under control, and then the officers can get there and finish the job. Yeah, but why are they just standing around? I mean, they're not even helping. That's what I'm not understanding. See, I appreciate that the officers try to remain calm. I don't want hysterical police officers, but I can't imagine just kind of standing there while this very dramatic course of events that lead to somebody's death, whether they caused it or not, and where you think this very strong, potentially psychologically impaired person is out of control and all of that, you're just kind of standing there going, I wonder what I'm going to have for dinner tonight. It seems very strange to me and very kind of inconsistent with the notion that they're trying to bring this guy down, and this is a very intense and difficult situation. Well, I'm not sure at exactly what point of the video that your Honor is talking about, but there is – It's before he's – it's before the mother comes out and says he's schizophrenic. It's when there's a lot of screaming, and there is – right in camera view, like basically what you're seeing, because you're not seeing what I'll – that's one of a better term, and I don't mean it disrespectfully. You're not seeing the action. You're just seeing this guy standing there kind of wandering around. And I just – that seems – it seems odd to me. It's almost like you have a split screen between like what's happening back home and what's happening over here in the field, but they're all in the same area. How can these officers be acting like that when there's this genuine situation going on? I mean, it seems inconsistent with saying that there's this kind of lethal situation happening or potentially very dangerous situation happening. Well, there are six officers that can be seen following Mr. Abernathy and the dog through the screen, through the shot, and they go over and deal with Mr. Abernathy, or at least they're the ones that start dealing with him. Officer Preston is the one that tackles him to the ground. The other officers then join in and attempt to get him handcuffed. There are other officers that are basically there for crowd control, and those officers I think are probably the officers that you've seen, Your Honor. And I think that that – and one of them – So they're just there to stand guard, so to speak. That's correct. I mean, there is – there's always a possibility that people are going to come out of their homes and want to get involved in that sort of situation, and, in fact, that is, in fact, exactly what happened in this case with Mr. Williams. Lee Griffin, the brother, they wanted to go down to the scene and get involved in it, and so there are officers that are stationed there for crowd control, and that's what they were doing. He says that there's officers who are actually supporting the plaintiff's version of events. What do you say to that? I am unaware of which plaintiffs he's talking about exactly, but, no, I don't think there are any officers that are supporting the plaintiff's version of events. That they were still beating him even when he wasn't resisting, he said. Oh, okay, okay. I'm sorry. There's two – there are – well, they're not plaintiffs. One is Juwan Williams. No, a plaintiff's version of events isn't – the plaintiff is dead. I'm sorry. But, I mean, the version of events in which officers are using excessive force would include beating someone who's not resisting. Would you please respond to that? Yes, Your Honor. There are essentially two witnesses, really, that are able to see anything that's going on up in the Hover Mail yard, and that's Mr. Juwan Williams, the tech sergeant in the Air Force, and Lee Griffin, the brother. Neither of those officers can see Mr. – I'm sorry. Neither of those individuals can see Mr. Abernathy's hands or what he's doing in terms of resisting the officer's attempts to handcuff him. What they can – what Mr. Williams testified to was that he saw boots, that he saw kicking action, that he saw officers striking Mr. Abernathy, that he saw officers pulling each other out of the way to get back in. All of that, Your Honor, is completely consistent with what the officers testified to, except that was forced. It was necessary to bring Mr. Abernathy under control. Mr. Abernathy, again, was very strong. They could not get his hand out. At one point, he grabbed Officer Tomez's leg. Officer Tomez believed that he may be going for his gun, so Officer Tomez struck him two times in the face at that point. Other officers were giving him body strikes to attempt to get him to give up his hand so that he could be handcuffed. Are there any officers who said that they continued to beat him after he stopped resisting or when he was not resisting? Absolutely not. Okay. Because I may have misheard your opponent, but that's what I thought he said, and that was news to me, so I was trying to understand your response to that. No. Okay. Mr. So basically, Your Honor, well, let me back up to Mr. Williams. Mr. Williams admitted in his deposition testimony that he could not see Mr. Abernathy's hands when the officers were struggling with him. Lee Griffin, his brother, could not see his hands when the officers were struggling with him. There's no evidence as to that whatsoever, what force was necessary or what force was unnecessary, rather, from those two witnesses. Who testified about hearing officers laughing? I think the family members did, Your Honor. The mother testified to that. Probably the sister and all of the family members probably testified to the officers laughing. But it's unclear from the record whether they're talking about at what point they're talking about the officers laughing, whether they're talking about the officers that were involved in subduing Mr. Abernathy laughing or whether they were talking about the officers that were engaged in crowd control laughing. How about the trying to get an officer out of the way so that he could go in and have his turn? Well, I think maybe what they might have seen, Your Honor, is that there were, if you listen, and I'm sure the court has listened to the tapes, to the audio, but listening to the audio, you can hear how winded those officers are. And there are a couple of officers, Officer Diaz, Officer Flores, that come in fresh, and Officer Tomez at one point was fresh, that may have been pulling the other officers out of the way so they could get in and assist as opposed to the fatigued officers continuing to attempt to subdue Mr. Abernathy, who, again, was incredibly strong. Not only was he 6'1", 250 pounds, but he was also high on cocaine. I thought I read not that it matters that he was 5'11", and the witness was 6'1". Well, there's one statement that says that he's 5'11". The autopsy report says 6'1", 250. Let me ask you this. If this is not a case where qualified immunity doesn't apply, then what is? At what point are we going to allow officers to be held accountable for this kind of conduct? I think that's a pretty easy answer, Your Honor. That is, had they continued using force against Mr. Abernathy after he was handcuffed, then they would be held accountable for excessive force. I think anything that once an individual is subdued and if force is used after that point when it's unnecessary, then at that point I believe they lose their qualified immunity. It becomes objectively unreasonable to use force at that point. Mr. Gale seems to be arguing that there is sort of degrees of force and that while Mr. Abernathy needs to be subdued during the subduing period, that it's not proper if he's only, and I'll put that in quotes, a DWI perpetrator. It's not proper to use some of the force that was used because you have to kind of weigh the force relative to the potential crime and so on and so forth. Do you have a response to that? I think that first of all, those kind of are the gram factors, the severity of the crime at issue also, and the severity as the district court pointed out. In this case, the severity was, and we didn't talk about the entire chase, but Mr. Abernathy was originally going the wrong way on a one-way street. A car had to move over to avoid being hit by him. He took officers through a parking lot a couple of times. He went through a shell station where there were other people that he had to dodge. He, in fact, went through there, not only other people but other officers, I think. When he finally got to his house, he could. The district court makes the point that it's conceivable he could have gotten back in his car and driven again, injured people. One of the other gram factors is if he's evading arrest, which he obviously was doing at this point. I mean, all he had to do, really, we wouldn't be here today if he'd have given up his left hand. But regardless, he did evade the officer's attempts to arrest him and did so with a great deal of strength and stamina and perseverance. So I think that the officers were entitled to use the force that they used to subdue Mr. Abernathy. I don't think that was excessive at all. And I'm not sure if I answered your question. Well, I'm wanting you to see do you agree with the notion that there are sort of gradations depending on the type of crime because, again, I mean, I don't mean to keep dwelling on Pratt, but there wasn't much of a crime at all, frankly, with Mr. Pratt. And he ended up dead and hogtied and dead. And so that seems pretty extreme to me. I think a DWI is a much more dangerous crime than just standing around waving your arms acting crazy. I think so, too. And I think that Mr. Abernathy's reaction was a lot more serious and potentially dangerous than standing around waving his arms and looking crazy. He never fought with the police. He only tried to get to his mother's house, right? Well, Your Honor, he tried to get to his mother's house originally, although the officers did not know at that time that it was his mother's house. And even if they had known it was his mother's house, they didn't know what was inside once he got inside, whether there were weapons, et cetera. No, but my point is he was not struggling or hitting them. He was not fighting the officers. He was just trying to continue on. I think that's a fair statement, Your Honor. I don't think there's any evidence in the record that he was striking back at the officers. The closest that I could come to that would be when he grabbed Officer Tomasz's leg during the struggle in Mr. Holberman's front yard. Officer Tomasz was afraid that he was maybe trying to crawl up his leg to get to his weapon. That would be the closest that I could come to. But he was resisting. Then how was he resisting? I mean, I guess I'm having trouble understanding the answer you just gave. He's not punching, but then how is he resisting? He's resisting because he is keeping his left hand away from the officers and he's thrashing around avoiding their attempts to handcuff his left hand. So that's how he's resisting. And then he was also running and trying to break into houses. Right. Not only his mother's house, but a neighbor's house. Mr. Knowles, your time has expired. Thank you. Thank you very much. Mr. Gale, you have five minutes on the bubble. Let's take for a second an individual who walks up to a police officer and says some rather filthy curse words to him. And the officer gets mad, pulls out his asp, starts beating the individual. We could say that had he not said something to that individual, if he had not said something to that officer, then none of that would have happened. But their training, that they're specifically trained for, teaches them that it is not necessarily the act that occurs that justifies it. So I understand Mr. Raul's position, but just because somebody has committed a crime does not necessarily justify the use of force. It is one of the factors to determine the severity of the crime, the application of the force, what type of force is used, the need for that force, the relationship between those two. When we're looking at these factors in regards to this particular case, the extent of the injuries suffered are just astronomical in regards to this case. And when we look at the threat, by all accounts, there was no threat to the officers. You have people walking around, milling around, just kind of taking their time, watching the scene. And what you have, by all accounts, is even a question in regards to whether there was actually the attempted handcuffing that they described. There was evidence in the record that shows that they weren't really handcuffed and they were less concerned with that and they were just concerned with everybody getting a take at Mr. Abernathy. That's what was going on. And there is sort of a continuum in regards to this case. So what's your best case for prong two of qualifying immunity? In other words, that no reasonable officer could have thought what he was doing was okay. In other words, every officer would have known that this was a violation of Mr. Abernathy's constitutional rights. What's your best case for us to look to? Because Mullinex is the last, and maybe not the last, a recent one in a long line of Supreme Court cases saying we need a case in these excessive force cases. So point me to that case. You know, Ann, I wish I had an easy answer for it. I mean, I think that on the facts of this case, it's a very difficult one to find something that has similar facts. I mean, whenever we're looking at the first prong of whether or not a constitutional violation has occurred, we're always looking to see whether it's clearly established. And this Court has said you don't have to find a case specifically in point. And I would be very hard-pressed to find one even similar to this. Yeah, but we're bound by the U.S. Supreme Court. And they have kind of like once a year, I think, over the last few years. Don't call me on that. But fairly frequently over the last few years they have reiterated this in increasingly more clear tones, shall we say. And so I am bound to listen. Again, it doesn't really matter what I think the law should be. It matters what the law is, and I took an oath to follow it. So I'm asking you, consistent with 10 different U.S. Supreme Court cases, point me to the case that put Officer Diaz, Fletcher, Galvan, Flores, Plasche, Quintanilla, and Tamez, and Trigo on notice that their specific conduct is violating Mr. Abernathy's constitutional rights. I think you have to go back to Graham v. O'Connor. I mean, I think really sticking with what sets up the standard board is what you need to look at. And while there may be a plethora of cases that have been analysed in regards to either specifically tasers or specifically hand or specifically kicking or anything of that nature, hog tying, things of that nature, this case pretty much has all of it. I mean, I did a little flow chart here just figuring out who did what. I mean, everybody admits to tasing just about. You've got one officer that admits to four strikes with an ass, two kicks, three hits to the head. You've got other people hitting to the head. You've got other people hitting to the body. You've got kicks all over the place. You've got kind of runs to the gambit. So you should be able to point us to a case. I mean, Graham is a high degree of generality. We've been told we can't use a high degree of generality. So if there's so much here, you should be able to point us to a case. And I'm genuinely asking so I can go read this case and make sure I'm familiar with it and be sure I get this right because I understand the family is very upset about this. I understand the city has got their position. I just want to make sure I'm following the law correctly in this case. So I'm happy for you to give me this case that you want me to look at. And I apologize that I'm not able to give it to you right at this moment. I'm sorry I'm not able to do that. But I really do believe that this is a case that was meant for a jury. It was one that, you know, even according to the court, was arguably excessive. And it needs the ability to argue that. Now, that doesn't mean we're going to win a trial. We may very well lose a trial, and a jury won't find that it applies. But it needs to be given that chance. And I appreciate my time. Thank you, Mr. Gale. That completes that case, which we will take under advisement.